**GENESEE BREWING COMPANY, INC., d/b/a Highfalls Brewing Company, Plaintiff–Appellant,**

v.

**STROH BREWING COMPANY, d/b/a Northern Plains Brewing Company, Defendant–Appellee.**

**No. 1560, Docket 96–9566.**

United States Court of Appeals, Second Circuit.

Argued June 2, 1997.

Decided Aug. 22, 1997.

Richard D. Rochford, Jr., Nixon, Hargrave, Devans & Doyle LLP, Rochester, NY (Harry P. Trueheart, III, James D. Kole, of counsel), for Plaintiff–Appellant.

Ralph T. Rader, Rader, Fishman & Grauer, PLLC, Bloomfield Hills, MI (Paul R. Braunsdorf, Harris Beach & Wilcox, LLP, Rochester, NY, of counsel), for Defendant–Appellee.

Before: NEWMAN, Chief Judge,
KEARSE and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

This trademark case concerns the right of a brewer to identify its beer with the words "Honey Brown." Beer can be either lager or ale, and in this case, the plaintiff uses the words "Honey Brown" (and others) on its lager product, while the defendant uses the same words (and others) on its ale product. In resolving the appeal, we explicitly endorse the rule that, when a producer creates a new product that differs from an established product class in a particular characteristic, the law of trademark will not grant the producer the exclusive right to label its product with words that are necessary to describe that new characteristic. Applying that rule, we find that the phrase "Honey Brown" is generic as applied to ales—such as the beer produced by the defendant—since those words are needed to describe a beer in the traditional category of "brown ale" that is brewed with the addition of honey. Because the plaintiff's beer is a lager, and not an ale, and "brown lager" is not a traditional category of beer, it is perhaps possible that the phrase "Honey Brown" may not be generic as applied to the plaintiff's own product. But that is a question we need not decide today. It is enough for us to hold that since the words "Honey Brown" are generic as applied to the defendant's product, the defendant has a right to use them and the plaintiff cannot recover for trademark infringement. The plaintiff may be able to recover for unfair competition, but the particular preliminary relief sought is inappropriate given the generic nature of the words "Honey Brown" as used by the defendant on its product. We therefore affirm the district court's denial of a preliminary injunction.

## BACKGROUND

In this era of renewed interest in quality beers, sometimes dubbed the "Renaissance of Beer," MICHAEL JACKSON, MICHAEL JACKSON'S BEER COMPANION 8 (1993) [hereinafter, JACKSON, BEER COMPANION] many large brewing companies have attempted to cash in on the growing consumer demand for unique, well-made beers, by brewing specialty beers of their own. See Thomas H. Walters, Note, *Michigan's New Brewpub License: Regulation of Zymurgy for the Twenty–First Century*, 71 U. DET. MERCY L. REV. 621, 668 & n. 416 (1994). In order to conceal the identity of the producer—beer connoisseurs are typically wary of mass-produced beers—these companies market specialty beers under small-town names. See Bill McDowell, *In Craft Beer, It's "Style" over Brand Substance*, ADVERTISING AGE, Mar. 10, 1997, at 20 (noting that "major breweries have been ... criticized for building marketing cachet by hiding their own specialty beer efforts behind subsidiaries with faux-microbrand names"). And so it is with this case, a dispute between two of America's largest brewing companies—the Genesee Brewing Company ("Genesee") and the Stroh Brewing Company ("Stroh")—doing business as Highfalls Brewing Company and Northern Plains Brewing Company, respectively.

Despite extensive efforts, many large brewers have had little success in the craft-

brewing business. Occasionally, however, a large brewer develops a specialty beer that becomes a popular favorite. A recent example is plaintiff Genesee's "JW Dundee's Honey Brown Lager." Sales of that brew, which was introduced in January 1994, have climbed to over 2.5 million cases a year, making it one of the four best-selling specialty beers in the country.

Genesee refers to this beer simply as "Honey Brown." Apparently, prior to Genesee's product, no beer had been marketed with a brand name that included those words. Genesee's labeling and advertising emphasize "Honey Brown," and Genesee chose that title as the beer's "bar call."[1] Consumers have followed suit. The record is flooded with menus, fliers, and unsolicited letters that confirm 1) that a large number of beer drinkers refer to Genesee's product using only the words "Honey Brown," and 2) that many menus list "Honey Brown" among brands of beer, like "Budweiser" and "Coors."

Genesee filed in the United States Patent and Trademark Office for a trademark for its entire product name—"JW Dundee's Honey Brown Lager." The trademark examiner initially rejected Genesee's application, requiring that Genesee disclaim any trademark in the words "Honey Brown." Genesee refused to do so, and appealed to the Trademark Trial and Appeal Board. While that application was pending, the trademark examiner backed down and sent Genesee's trademark application to publication without requiring Genesee to disclaim the right to "Honey Brown."[2] Although it has been published, Genesee's trademark has encountered opposition and has yet to be registered.

In early 1996, defendant Stroh began to market "Red River Valley Honey Brown Ale," with the conceded purpose of competing with Genesee. Stroh's label and advertising, like Genesee's, place emphasis on the words "Honey Brown." Aware of Genesee's attempts to secure exclusive use of those words, Stroh intervened in Genesee's trademark application proceeding, which is now before the Trademark Trial and Appeal Board on Stroh's opposition. That body has stayed the proceedings pending the outcome of this case.

Once Stroh began to produce its "Honey Brown," other brewers introduced products with these words in their names. There are now numerous beers in the marketplace with brand names that contain the words "Honey Brown," including "J.J. Wainwright's Evil Eye Honey Brown," "Bank Draft Honey Brown Ale," "Tivoli Honey Brown Lager," and "Algonquin Honey Brown Lager."

In October 1996, alleging that Stroh had violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by appropriating Genesee's unregistered trademark and engaging in unfair competition, Genesee filed suit in the United States District Court for the Western District of New York seeking to enjoin Stroh from using the words "Honey Brown" on its product, and to require Stroh to recall and destroy any bottles of Red River Valley Honey Brown Ale currently on the market. In an unpublished opinion dated November 19, 1996, the district court (Michael A. Telesca, *Judge*) denied Genesee's motion for a preliminary injunction, concluding 1) that Genesee was not likely to succeed on the merits of its trademark claim, because "Honey Brown" is a generic term that cannot be trademarked; 2) that Genesee was not likely to

---

**1.** As used by the parties in this case, the term "bar call" refers to the name used by bartenders, waitpersons, and customers to order or refer to different brands of beer.

**2.** Disclaimer is a well recognized practice in trademark registration. Often the mark submitted for registration is a composite term, consisting of registrable subject matter in conjunction with matter which was ... unregistrable. The Patent Office administratively began the practice of allowing such unregistrable matter to be disclaimed, so that the mark as a whole might be registered, although as a complete term the mark included unregistrable descriptive matter. This administrative practice received judicial sanction in Estate of P.D. *Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46, 40 S.Ct. 414, 416–17, 64 L.Ed. 705 (1920), and was expressly authorized in [§ 6 of the Lanham Act, 15 U.S.C. § 1056].
*Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 n. 5 (4th Cir.1984) (internal quotation marks omitted).

succeed on the merits of its unfair competition claim, because Stroh had not acted in bad faith; and 3) that the balance of the hardships favored Stroh.

This appeal followed.

## DISCUSSION

■ In order to obtain a preliminary injunction, a party must demonstrate: 1) that it is subject to irreparable harm; and 2) either a) that it will likely succeed on the merits or b) that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships tips "decidedly" in favor of the moving party. *See Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir.1996) (citing *Jackson Dairy v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion, which occurs, *inter alia*, when the district court applies the wrong legal standard or bases its decision on clearly erroneous findings of fact. *See id.*

### I. Irreparable Harm

■ In the context of trademark and unfair competition injunctions, the requirement of irreparable harm carries no independent weight, as we have held that a showing of likelihood of confusion (a requirement of both trademark infringement and unfair competition claims) establishes irreparable harm. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988).

### II. Likelihood of Success on the Merits [3]

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a federal private cause of action for injunctive relief and damages against a manufacturer who "uses in commerce any word, term, name, symbol, or device" or "any false designation of origin" that is "likely to cause confusion" as to the origin of its product. Section 43(a) may pro-

tect unregistered trademarks from infringement, and even offers a degree of protection from unfair competition for "unregistrable marks," such as generic words that have acquired significant secondary meaning.

### A. Unregistered Trademark Infringement

Section 43(a) may "protect[ ] an unregistered trademark ... against infringement." *Grupke v. Linda Lori Sportswear, Inc.*, 921 F.Supp. 987, 994 (E.D.N.Y.1996) (citing *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir.1991)). "[T]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992).

Thus, Genesee will prevail on the merits of its unregistered trademark infringement claim if it can show that "it has a valid [trade]mark entitled to protection and that the defendant's use of it is likely to cause confusion." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995) (citation and internal quotation marks omitted). We agree with the district court that Genesee does not have a trademark in the words "Honey Brown" that can be protected against appropriation by Stroh. Accordingly, we affirm without reaching the question of likelihood of confusion.

■ A trademark is "any word, name, symbol, or device, or any combination thereof" used by a person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. "[F]ollowing the classic formulation set out by Judge Friendly," trademarks are divided into five general categories of distinctiveness: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; and 5) fanciful. *Two Pesos, Inc.*, 505 U.S.

---

**3.** We find that the district court acted within its discretion in concluding that the balance of the hardships does not tip decidedly in favor of Genesee. Forcing Stroh to recall and stop marketing its product pending the completion of this litiga-

tion would cause it serious harm, harm at least as great as any that Genesee might suffer from Stroh's continuing to sell its ale. We therefore discuss only the likelihood of success on the merits.

at 768, 112 S.Ct. at 2757 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)). "A generic mark is generally a common description of goods," *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993), "one that refers, or has come to be understood as referring, to the genus of which the particular product is a species," *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). "A descriptive mark describes a product's features, qualities or ingredients in ordinary language," *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572, or "describes the use to which a product is put," *Hasbro*, 858 F.2d at 73 (citation and internal quotation marks omitted). "A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of goods." *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572 (citations and internal quotation marks omitted). "[T]he term 'fanciful', as a classifying concept, is usually applied to words invented solely for their

use as trademarks. When the same legal consequences attach to a common word, *i.e.*, when it is applied in an unfamiliar way, the use is called 'arbitrary.' " *Abercrombie & Fitch*, 537 F.2d at 11 n. 12.

Marks that are arbitrary, fanciful, or suggestive are considered "inherently distinctive," and are automatically entitled to protection under the Lanham Act, 15 U.S.C. §§ 1051, *et seq. See Two Pesos*, 505 U.S. at 768, 112 S.Ct. at 2757. Marks that are descriptive are entitled to protection only if they have acquired a "secondary meaning" in the marketplace. *Id.* at 769, 112 S.Ct. at 2757–58.[4] Generic marks are never entitled to trademark protection. *See Abercrombie & Fitch*, 537 F.2d at 9 ("[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name.").

The district court found that "Honey Brown" is generic, and hence automatically

---

4. On the issue of secondary meaning, we look to see whether the registrant's appropriation of the mark conferred subsequent significance to the previous meaning of the term, and this depends on whether a significant number of prospective purchasers understand the term when used in connection with the particular kinds of goods involved in the registration certificate as indicative of an association with a specific entity. In other words, if the term, although not inherently distinctive, comes through use to be uniquely associated with a single source, it is entitled to protection under the same principles applicable to inherently distinctive designations. The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source. To qualify for trademark protection, an owner of a descriptive mark must demonstrate that the mark had acquired secondary meaning before its competitor commenced use of the mark. *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir.1990) (citations and internal quotation marks omitted). Factors that are relevant in determining secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." *Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1222 (2d Cir.1987).

In this case, Genesee offered evidence of millions of dollars in advertising, numerous attempts to copy, and significant sales success and media attention. Genesee also conducted a massive survey indicating that 81% of consumers associate "Honey Brown" with beer from one source. Stroh sought to discredit Genesee's evidence and survey. Agreeing with Stroh, the district court found that, even if it were to consider "Honey Brown" to be descriptive, it would not find secondary meaning. We will not review that finding here. We do note, however, that the principal reason given by the district court does not support its conclusion. The district court conflated the issue of whether or not the trademark is generic with the question of secondary meaning, and found Genesee's survey flawed because it failed to consider the possibility that consumers believed "Honey Brown" to emanate from one source, but nonetheless to be a category of beer. While that omission may be an important one in determining whether "Honey Brown" is generic, it is not germane to the secondary meaning inquiry. The question of secondary meaning becomes relevant only when it has been determined that "Honey Brown" is *not* a generic category of beer. At that point, Genesee's survey (if valid) would be highly probative. Furthermore, this secondary meaning inquiry is germane to a claim of unfair competition. *See infra* Part II.B.

ineligible for protection. That classification is a fact-bound determination, and so long as the district court utilized the correct legal standard, *see, e.g., Hasbro*, 858 F.2d at 74 (reversing a district court's classification because the court had misapplied the law), it will be upheld unless clearly erroneous, *see Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039–40 (2d Cir.1992).

Genesee argues that the district court, by basing its conclusion that "Honey Brown" is generic solely on the framework laid out in the Third Circuit's opinion in *A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3d Cir.1986) (Becker, *J.*), rather than on the "primary significance test" used in this circuit, employed the wrong legal standard. We reject this contention.

 The "primary significance test" is the law of the land; it was adopted by the Supreme Court in *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938), and subsequently codified by Congress in the Trademark Clarification Act of 1984, Pub.L. No. 98–620, § 102, 98 Stat. 3335 (codified at 15 U.S.C. § 1064). Under this familiar test, a plaintiff seeking to establish a valid trademark "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg*, 305 U.S. at 118, 59 S.Ct. at 113. To satisfy this requirement, a trademark need not only and exclusively indicate the producer (the "source"), but may, instead, serve a " 'dual function—that of identifying a product while at the same time indicating its source,' " *Canfield*, 808 F.2d at 300 (quoting S.Rep. No. 98–627, 98th Cong. 5 (1984)). "[A] mark is not generic merely because it has *some* significance to the public as an indication of the nature or class of an article. In order to become generic the *principal* significance of the word must be its indication of the nature or class of an article, rather than an indication of its origin." *King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 580 (2d Cir.1963) (citation and internal quotation marks omitted).

The Third Circuit did not disregard the primary significance test in *Canfield*. Rather, it explained that the test—of itself—is of limited usefulness when the operative question is whether a new product name, even if it does tend to indicate the producer or source of the product, *must nonetheless* be considered a product genus or type, rather than merely a product brand. *See Canfield*, 808 F.2d at 299–301. For, as Judge Becker noted in *Canfield*, the "primary significance" test suffers from a potential weakness: it does not tell us how to deal with situations in which, while "a term signifies a product that emanates from a single source," that term is needed also to designate "not only a product brand but . . . also a product genus." *Id.* at 301.

In confronting these situations, courts must remember that

> [t]he genericness doctrine prevents trademarks from serving as the substitutes for patents, and protects the public right to copy any non-patented, functional characteristic of a competitor's product. Trademark law seeks to provide a producer neither with a monopoly over a functional characteristic it has originated nor with a monopoly over a particularly effective marketing phrase. Instead the law grants a monopoly over a phrase only if and to the extent it is necessary to enable consumers to distinguish one producer's goods from others and even then only if the grant of such a monopoly will not substantially disadvantage competitors by preventing them from describing the nature of their goods. Accordingly, if a term is necessary to describe a product characteristic that a competitor has a right to copy, a producer may not effectively preempt competition by claiming that term as its own.

*Id.* at 305 (citations omitted). Thus, explained Judge Becker,

> to be consistent with the primary significance test, whether a product brand with a name used by one producer constitutes its own genus must turn on the extent to which the brand name communicates functional characteristics that differentiate the brand from the products of other producers. In making these calculations, consumer understanding will determine the extent to which a term communicates functional characteristics and the significance

of a term's role in doing so because of a dearth or abundance of alternative terms that effectively communicate the same functional information.

*Id.*

With these principles in mind, the *Canfield* court, relying on our decision in *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir.1975) ("To allow trademark protection for generic terms, *i.e.*, names which describe the genus of goods being sold, even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are."), promulgated a test to determine if a new product name must be deemed also to refer to a product genus or type, rather than simply to an individual product brand:

> If a producer introduces a product that differs from an established product class in a particular characteristic, and uses a common descriptive term of that characteristic

as the name of the product, then the product should be considered its own genus. Whether the term that identifies the product is generic then depends on the competitors' need to use it. At the least, if no commonly used alternative effectively communicates the same functional information, the term that denotes the product is generic. If we held otherwise, a grant of trademark status could effectively prevent a competitor from marketing a product with the same characteristic despite its right to do so under the patent laws.

*Canfield*, 808 F.2d at 305–06 (citation and footnote omitted). We adopt that test today, and conclude that *Canfield* is based on long-standing and integral principles of trademark law. As such, it is a useful complement to, rather than a rejection of, the primary significance test.[5]

The case before us is appropriate for analysis under *Canfield*.[6] Like *Canfield* (which concerned "Diet Chocolate Fudge Soda"), the case involves, in Judge Telesca's words, "a

---

**5.** To be a valid trademark, a mark must not only be source-denoting, but it must also be nonfunctional. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164–66, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995) ("The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions ...."); *see also Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 84 (3d Cir.1982) (noting that trademark law must "avoid affording undeserved patent protection"); *Anti–Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 300 (9th Cir.1979) ("Trademarks are not properly used as patent substitutes to further or perpetuate product monopolies.") (citation omitted); *CES Publishing Corp.*, 531 F.2d at 13 (noting that trademark law must not "grant the owner of the mark a monopoly").

This fundamental principle of trademark law that a trademark is not a patent and does not grant a monopoly of production gives rise to a corollary maxim that where the nature of a new product can be expressed in only one way, a manufacturer may not trademark the words necessary to describe the product. *See Holzapfel's Compositions Co. v. Rahtjen's Am. Composition Co.*, 183 U.S. 1, 9, 22 S.Ct. 6, 8–9, 46 L.Ed. 49 (1901) (refusing to grant protection to "the only name by which it was possible to describe" the product); *W.T. Rogers Co. v. Keene*, 778 F.2d 334,

339 (7th Cir.1985) (noting that trademark protection should be denied when a manufacturer tries to monopolize the few words that can be used to describe the product); Ralph H. Folsom & Larry L. Teply, *Trademarked Generic Words*, 89 Yale L.J. 1323, 1328–29 (1980) ("[W]hen no name other than the trademarked word is available to the public or competitors to indicate the type or class of product on which the trademark is used, exclusive control of the trademarked word has not been permitted.").

**6.** In a sense, the *Canfield* rule is to trademark law what the "merger doctrine" is to copyright law. We have stated the merger doctrine thusly:

> The fundamental copyright principle that only the expression of an idea and not the idea itself is protectable has produced a corollary maxim that even expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself.

*Hart v. Dan Chase Taxidermy Supply Co.*, 86 F.3d 320, 322 (2d Cir.1996) (internal quotation marks omitted); *see also Baker v. Selden*, 101 U.S. (11 Otto) 99, 25 L.Ed. 841 (1879). And just as the merger doctrine will not apply where the underlying idea "remain[s] capable of many other expressions," *Kregos v. Associated Press*, 937 F.2d 700, 707 (2d Cir.1991), so the *Canfield* rule will not apply unless "no commonly used alternative effectively communicates the same functional information," *Canfield*, 808 F.2d at 306.

relatively new product that ... differs from an established product class in a significant, functional characteristic," and "uses the common descriptive term for that characteristic as its name." As such, although "Honey Brown" is clearly descriptive of Genesee's product—the beer is sweet, flavored with honey, and deep brown in color—it still might, of necessity, signify a generic category (or subcategory) of beer. *Cf. Anheuser–Busch, Inc. v. John Labatt Ltd.*, 89 F.3d 1339, 1346 (8th Cir.1996) (upholding a jury's verdict that "ice was and always had been the name of a beer category"), *cert. denied*, —— U.S. ——, 117 S.Ct. 944, 136 L.Ed.2d 833 (1997); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 80–81 (7th Cir.1977) (holding that "light" beer is a generic category of beer).[7]

Employing the *Canfield* analysis, the district court had little trouble concluding that Genesee's mark is generic as applied to Stroh's product. We find the issue somewhat more complicated than did the district court, but we reach the same result.

The district court accepted Stroh's assertion that "brown beer" is a category of beer, and found that "Honey Brown" differs from this category by the addition of the descriptive word "honey"—which is not an ordinary ingredient of brown beers—and that "[t]he word 'honey' is a commonly used descriptive term for which there is no effective equivalent." Accordingly, the district court concluded that "Honey Brown" is a generic mark not entitled to protection.

The problem with the district court's analysis is that, as Genesee correctly argues, there is no such category of beer as "brown beer." Beers have traditionally been divided into two general categories: 1) ales, which are fermented at high temperatures for short periods of time; and 2) lagers, which are fermented at low temperatures for longer periods of time.[8] *See* JACKSON, BEER COMPANION, at 66 ("In modern usage, ale indicates a brew that has a warm fermentation, traditionally with strains of yeast that rise to the top of the vessel. These 'top-fermenting' yeasts distinguish ales from lagers, where the yeasts work at cool temperatures, at the bottom of the vessel.").[9] Until the development of lagering techniques in the 19th century, all beers were made with ale yeasts. *See* MICHAEL JACKSON, THE NEW WORLD GUIDE TO BEER 9–10 (1988) [hereinafter, JACKSON, WORLD GUIDE]. Today, most English, Irish, Scottish, and Belgian beers are ales, while most German, Czech, Austrian, and Dutch beers are lagers. *See* JACKSON, BEER COMPANION, at 66–67, 196–97.

The category of ales is further divided into numerous subcategories (*e.g.*, pale ale, porter, stout), as is the category of lagers (*e.g.*, pilsner, bock, Oktoberfest). *See* Joint Appendix at 596 (listing the style categories used at the 1996 Great American Beer Festival). Thus, "ale" and "lager" are to zymurgy what "plant" and "animal" are to biology—the primary taxonomic divisions, each of which is further subdivided into numerous more specific but still generic classifications.

One traditional subcategory of ale is brown ale. *See* FRED ECKHARDT, THE ESSENTIALS OF BEER STYLE: A CATALOG OF BEER STYLES FOR BREWERS AND BEER ENTHUSIASTS 108–09 (1989) (describing the style of "Brown Ale"); JACKSON, BEER COMPANION, at 89, 118 (listing "English brown ale" and "Flemish brown ale" as styles of ale); JACKSON, WORLD GUIDE, at 12 (describing the category of "Brown

7. But cf. G. Heileman Brewing Co. v. Anheuser–Busch, Inc., 873 F.2d 985, 997–98 (7th Cir.1989) (holding that the term "LA," as applied to a beer that is low in alcohol, is descriptive rather than generic); Anheuser–Busch Inc. v. Stroh Brewery Co., 750 F.2d 631, 642 (8th Cir.1984) (finding "LA" suggestive rather than generic). So long as a brewer can indicate the lower alcohol content of his or her beer without using the mark "LA," these cases do not run afoul of *Canfield*.

8. Some beers are brewed from wheat rather than barley. Some experts consider wheat beers to be a third category of beers, *see, e.g.*, Declaration of Gregg Smith (historian of beer), Oct. 23, 1996, Joint App. at 196, while others subsume wheat beers into the two general categories of lagers and ales, *see, e.g.*, Joint App. at 596 (list of categories of beer styles at the 1996 Great American Beer Festival). Neither Genesee's nor Stroh's product is a wheat beer.

9. An ale "is likely to have a fruity aroma and palate, and often a complex flavor," JACKSON, BEER COMPANION, at 66, whereas "[l]ager yeasts produce beers that are characteristically clean and rounded, though not always complex," *id.* at 196.

Ale"); Garrett Oliver, *A Brown Ale Comeback*, ALL ABOUT BEER, July 1997, at 82 (describing the history of English and American brown ales); Declaration of Robert Haiber (historian of beer), Oct. 25, 1996, Joint Appendix at 210 ("Historically, generic brown ale has been brewed for thousands of years, dating back to Mesopotamia and Egypt."). There is no comparable subcategory of "brown lager." Nor is there a general category of "brown beer" that somehow encompasses both lagers and ales. *See* Joint Appendix at 596 (listing the style categories used at the Great American Beer Festival). Such a category would be antithetical to the fundamental notion that, absent a handful of hybrid and miscellaneous styles, all barley-based beer styles represent subcategories of the general categories of lager and ale.[10]

Stroh asserts first that "brown ale" is a category of beer, and then that any beer that is brown and includes honey can be placed in a "honey brown" subcategory of "brown ales." The problem with this analysis is that many beers that are using the name "Honey Brown"—including Genesee's—are not brown ales at all. They are not even ales; they are lagers. As such, it is simply not the case that Genesee's and Stroh's products both fall into the same subcategory of beer: brown ales brewed with honey. It follows that the district court's conclusion "that there is a category of 'brown' beers in the market place, and both plaintiff's and defendant's beers are distinct from that category in that they contain honey," was clearly erroneous.

■ This does not solve the problem, however. It merely complicates it. It is well-established that "[a] word may be generic of some things and not of others." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir.1980). "To take a familiar example, 'Ivory' would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap." *Abercrombie & Fitch*, 537 F.2d at 9 n. 6. Accordingly, "in various cases a word [has been] found to be generic in one application

but not in another." *Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 755 F.Supp. 1237, 1243 (S.D.N.Y.1991). For instance, in *Abercrombie & Fitch*, we found that the word "safari" was generic as applied to hats, jackets, and "expedition[s] into the African wilderness," but fanciful as applied to shorts, scarves, portable grills, and other items. *See Abercrombie & Fitch*, 537 F.2d at 11–14. And in *Polo Fashions, Inc. v. Extra Special Prods., Inc.*, 451 F.Supp. 555 (S.D.N.Y.1978), the court found it "clear that 'polo' is generic to polo shirts and coats, descriptive as to other shirts and coats and fanciful as it is applied to other articles of wearing apparel." *Id.* at 559; *see also Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F.Supp. 976, 978 (S.D.N.Y.1989) ("As applied to a serial in the funny pages, the words 'comic strip' might be deemed ... generic. As applied to a night-club providing live comedy entertainment, however, the terms take on another meaning" and are "at least suggestive."); *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372, 381 & n. 6 (D.Md.1976) (noting that, "as the name of a singing and entertainment group," the name "The Platters" is "arbitrary and distinctive," even though "[p]latter is a generic term as applied to dishes").

■ This same principle applies to the *Canfield* analysis. A mark that is descriptive, suggestive, arbitrary, or fanciful when applied to some products may nonetheless be generic when applied to certain other products, namely those products that require the use of the mark in order to convey their nature to the consumer. "Rosemary Fried Surfboards" would be an arbitrary mark entitled to protection. But "Rosemary Fried Chicken" would probably be generic, since "fried chicken" is clearly a product genus, and the words "rosemary fried chicken" are necessary for a chef effectively to communicate the fact that her fried chicken differs from most fried chicken in that it is flavored with rosemary. Similarly, "Dry White" is probably descriptive as applied to confetti or

---

**10.** It is arguable that a category of "red beer"—largely the creation of marketing and advertising, rather than brewmasters—which includes both lagers and ales has developed in the marketplace, in defiance of traditional beer taxonomy. *See, e.g.,* Jon Morgan, *Tops in Hops*, BALT. SUN, May 7, 1995, Sun. Mag. at 35. The record provides no support for the notion that there is a comparable category of brown beer.

toothpaste, but would perhaps be generic as applied to wine. Or finally, the owner of the "Red Hot Dating Service" would not be able to recover from the maker of "Acme Red Hot Dogs" for trademark infringement.

So it is with this case. It is conceivable—though we certainly do not suggest, let alone decide—that Genesee's mark—"Honey Brown"—when applied to a *lager* (like its own beer) might be deemed descriptive, rather than generic.[11] For this to be so, a court would have to find that there were ways to convey the fact that a lager is brown in color and flavored with honey without using the words "Honey Brown" (at least in the order or way that Genesee has used them to identify its lager), and that consumers at large (as opposed to the beer *cognoscenti*) did not understand "brown beer" (or "brown lager") to be a generic category of beer.[12] *Cf. Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F.Supp. 571, 580–82 (D.N.J.1985) (finding the term "Honey Roast" to be descriptive as applied to nuts); *Schmidt v. Quigg*, 609 F.Supp. 227, 230–31 (E.D.Mich.1985) (finding

the term "Honey Baked Ham" descriptive, and protectable because of secondary meaning).

But when applied to an *ale*, the mark is generic. There are numerous styles of beer in the marketplace, the names of which consist of a time-honored beer category modified by a new, creative ingredient or flavor. Examples include maple porter, pumpkin ale, nut brown ale, raspberry wheat, cranberry lambic, and oatmeal stout. In some of these new beer styles, the innovative ingredient is honey. As a result, there are honey wheats, honey porters, and honey cream ales on the market. Under the *Canfield* reasoning, which we have adopted, none of these names may be trademarked. Someone is always the first to sell these products, and if that brewer were granted a monopoly on the name, subsequent producers would lose the right to "describe [their] goods as what they are." *CES Publishing Corp.*, 531 F.2d at 13.[13]

That principle controls this case. There is a recognized category of beers in the market-

---

**11.** In sending the mark to publication without requiring that Genesee disclaim any right to the words "Honey Brown," the trademark examiner must have found those words to be protectable as applied to products such as Genesee's, since "section 12(a) of the Lanham Act only provides for publication when it appears that the applicant is entitled to the registration sought," *Stonecutter Mills Corp. v. Universal Overall Co.*, 54 C.C.P.A. 1537, 379 F.2d 979, 981 (C.C.P.A.1967); *see also* 15 U.S.C. § 1062(a), and a trademark examiner may not send a mark to publication unless all unprotectable matter has been disclaimed, *see* TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1213.02(b) (1993) ("If a mark is comprised in part of matter which, as applied to the goods and services, is generic or does not function as a mark, such matter must be disclaimed to permit registration...."). While it is true that the mark has yet to be registered, and therefore is not entitled to the statutory presumption of validity, *see* 15 U.S.C. § 1057(b); *Arrow Fastener*, 59 F.3d at 393 n. 6, we nonetheless "accord weight" to the initial conclusions of the Trademark Office. *Arrow Fastener*, 59 F.3d at 392–93; *see also D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1274 (S.D.N.Y. 1970) (finding, in the absence of a registered trademark, that "the expertise of the trademark examiners does entitle their views to respectful consideration").

**12.** Even if "Honey Brown" lager were descriptive, it would only be entitled to protection if it had acquired a secondary meaning in the mar-

ketplace, that is, if consumers primarily associated "Honey Brown" with a particular producer.

**13.** Cf. Aluminum Fabricating Co. v. Season–All Window Corp., 259 F.2d 314, 317 (2d Cir.1958) ("Nor does our affirmance of the Patent Office registration of 'Season-all' render it difficult for others in the business of selling other storm doors and storm windows adequately to describe their products. The English language has a wealth of synonyms and related words with which to describe the qualities which manufacturers may wish to claim for their products and the ingenuity of the public relations profession supplies new words and slogans as they are needed."); *Marks v. Polaroid Corp.*, 129 F.Supp. 243, 270 (D.Mass.1955) (upholding a trademark because "the need of competitors to satisfactorily describe their products is satisfied by the availability of several common nouns or adjectives"), *aff'd*, 237 F.2d 428 (1st Cir.1956).

Of course, the availability of alternative means of describing the product does not automatically preclude a finding that a trademark is generic. *See Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir.1985); *King–Seeley Thermos Co.*, 321 F.2d at 580. But the inverse proposition—that the lack of alternatives will render a mark generic—must be true, at least where a producer who has introduced a product that differs from an established class in one significant way attempts to trademark the only effective means of conveying that distinction.

place known as "brown ales." And Stroh's product, Red River Valley Honey Brown Ale (but not Genesee's product, JW Dundee's Honey Brown Lager) can be placed within that category,[14] or more precisely, within a new subcategory of that category—brown ales made with honey: "honey brown ales." Indeed, Stroh developed Red River Valley Honey Brown Ale by altering its "brown ale recipe to include honey and brown sugar which created a smoother and sweeter brown ale." Declaration of Joseph Hertrich, Vice President, Brewing, Stroh Brewing Co., Joint Appendix at 185. Because the addition of the word "honey" is necessary to indicate a brown ale that is brewed with honey, Stroh has the right to call its beer a "Honey Brown Ale."[15] Cf. Miller Brewing Co., 561 F.2d at 81 ("[Miller] could not acquire the exclusive right to use the common descriptive word 'light' as a trademark for that beer. Other brewers whose beers have qualities that make them 'light' as that word has commonly been used remain free to call their beer 'light.' Otherwise a manufacturer could remove a common descriptive word from the public domain by investing his goods with an additional quality, thus gaining the exclusive right to call his wine 'rosé', his whiskey 'blended', or his bread 'white.' ").

We therefore affirm the district court's conclusion that Genesee is not likely to succeed on the merits of its trademark infringement claim.

## B. Unfair Competition Involving Unregistrable Marks

Genesee also alleges that, even if "Honey Brown" is generic, an injunction is justified to prevent Stroh from engaging in unfair competition. The district court rejected this contention summarily: "To establish a claim of unfair competition, plaintiff must demonstrate, inter alia, bad faith on the part of the defendant in appropriating the plaintiff's mark. I note only that plaintiff has failed to establish bad faith, and thus has not established an unfair competition claim."

▮ The district court was correct that Genesee's state law claim of unfair competition is not viable without a showing of bad faith. See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 34–35 (2d Cir.1995). But a plaintiff may recover for unfair competition in violation of federal law without a showing of bad faith. See Johnson & Johnson v. Carter–Wallace, Inc., 631 F.2d 186, 189 (2d Cir.1980) (noting that § 43(a) of the Lanham Act "does not require proof of intent to deceive" in order to sustain a claim of unfair competition); Girl Scouts v. Bantam Doubleday Dell Publishing Group, Inc., 808 F.Supp. 1112, 1131 (S.D.N.Y.1992) ("Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent.") (internal quotation marks omitted), aff'd, 996 F.2d 1477 (2d Cir.1993). The lack of bad faith is therefore not dispositive of Genesee's federal unfair competition claim.

▮ The fact that Genesee's mark is generic as applied to Stroh's product also does not preclude a finding that Stroh has violated the Lanham Act by engaging in unfair competition. While a mark "may be generic and not entitled to trademark protection, [a] claim of unfair competition is not foreclosed." Murphy Door Bed Co. v. Interior Sleep Systems, 874 F.2d 95, 102 (2d Cir.1989).

Regardless of whether a term is trademarked, a plaintiff may show that the term name is so associated with its goods that use of the same or similar term by another

---

**14.** In fact, Red River Valley Honey Brown Ale competed in the "English Brown Ale" category at the 1997 World Beer Championships. See Buyer's Guide for Beer Lovers, ALL ABOUT BEER, July 1997, at 41.

**15.** In the beer industry, where beer types are commonly designated by the name of a special ingredient or flavor followed by a traditional beer category, such as maple porter, pumpkin ale, oatmeal stout, and honey wheat, it seems unlikely that possible alternatives such as "honeyed ale" or "honied ale" would effectively communicate to the consumer the same information as "honey ale." In any event, that is what the district court must be deemed to have found when it stated that, in this context, "the word 'honey' is a commonly used descriptive term for which there is no effective equivalent." Joint App. at 972. And that finding, given the usage of the beer trade, is not clearly erroneous.

company constitutes a representation that its goods come from the same source.

Courts typically grant relief, injunctive or otherwise, for misrepresentations as to the source of a product where a formerly exclusive trademark is no longer protectible because it has become generic. However, as the Supreme Court's decision in *Kellogg Co. v. National Biscuit Co.* demonstrates, relief is also available when the misrepresentation of source arises through the use of a phrase (like Swiss Army knife) that is generic *ab initio*.

*Forschner Group, Inc. v. Arrow Trading Co.*, 30 F.3d 348, 358–59 (2d Cir.1994) (citations omitted); *see also Metric & Multistandard Components Corp. v. Metric's Inc.*, 635 F.2d 710, 714 (8th Cir.1980).

In *Kellogg*, the Supreme Court held that, while subsequent producers have the right to use generic product names that have traditionally been associated with one manufacturer, those users have an obligation "to use every reasonable means to prevent confusion" as to the source of the products. *Kellogg*, 305 U.S. at 121, 59 S.Ct. at 115. Relying on *Kellogg*, we have explained that if

"the consumer associates '[Honey Brown]' with a particular manufacturer, perhaps because that manufacturer enjoyed a de facto (or de jure) monopoly for many years, there is a risk that the consumer may erroneously assume that any product entitled '[Honey Brown]' comes from that manufacturer. *A second manufacturer may increase the risk of confusion by, for example, using a similar label, similar packaging, misleading advertisements, or simply by failing to state the product's source. . . . [W]hen there is a likelihood that the newcomer might thus pass its product off as the original manufacturer's . . . a court [may] require the newcomer to distinguish its product or to notify consumers explicitly that its product does not come from the original manufacturer."*

*Forschner*, 30 F.3d at 359 (quoting *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1045 (D.C.Cir.1989)) (emphasis in *Forschner*). In other words—

even though "Honey Brown" is a generic mark at least as to ales—if "Honey Brown" is closely associated with Genesee's product, then Stroh's use of those words "is permissible only to the extent that such use does not engender a likelihood of confusion as to the source of [Stroh]'s product." *Id.* at 360.

Thus, to recover for unfair competition, Genesee must show: 1) "an association of origin by the consumer between the mark and the first user," *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 904 F.Supp. 1409, 1417 (S.D.N.Y.1995), that is, secondary meaning; and 2) "a likelihood of consumer confusion when the mark is applied to the second user's good," *id.* And Stroh will, nonetheless, escape liability if it has "use[d] every reasonable means to prevent confusion" as to the source of the products, *Kellogg*, 305 U.S. at 121, 59 S.Ct. at 115. The district court did not consider whether these factors had been shown.

Genesee has, in fact, proffered evidence that might, if believed and not sufficiently countered by Stroh's evidence, support a finding at trial of both secondary meaning[16] and a likelihood of confusion that Stroh has not taken all reasonable steps to prevent. Specifically, Genesee has attempted to show that, intentionally or not, Stroh is marketing its beer in such a way as to lead consumers to believe that they are getting Genesee's product. *Cf. Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 997 (7th Cir.1979) (explaining that, notwithstanding the lack of trademark protection for "light beer," Miller could have sustained an unfair competition claim if it could have shown: a "failure of Schlitz adequately to identify itself as the source of its beer; . . . a confusingly similar dress used by Schlitz for its beer, which might result from such factors as the label's style, [or] the relative size of words in the label . . .; [or] Schlitz' use of advertising calculated to lead to confusion"); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 662 (2d Cir.1979) (noting that unfair competition liability can arise when a defendant "confus[es] the public into mistakenly purchasing the product in the belief that

**16.** *See supra* note 4.

the product is the product of the competitor").

Genesee's beer has become the fourth best selling specialty brew in the country, and consumers and bartenders refer to it simply as "Honey Brown"—a phrase that had apparently never been used to describe a beer before Genesee introduced its product. The words "Honey Brown" dominate Genesee's labeling and advertising materials, and according to Genesee, consumers expect to get Genesee's product when they order a "Honey Brown."

Stroh has also chosen to emphasize the words "Honey Brown" on its label, rather than the words "Red River Valley" or "Honey Brown Ale." Stroh's marketing memoranda to distributors emphasize the need to compete with Genesee's product, and to beat Genesee into certain untapped markets, even though the two products are not, in fact, examples of the same subcategory of beer. And Stroh has arranged to have Safeway Food Stores counter-coupon Genesee's product. (This means that Safeway gives coupons for Red River Valley Honey Brown Ale to any person who purchases JW Dundee's Honey Brown Lager.) Moreover, according to Genesee, many of the restaurants and bars that list Genesee's product simply as "Honey Brown" on their menus and tap lists—which list brands of beer, not kinds of beer—have switched from Genesee's product to Stroh's less-expensive product without changing their menus.

All of this evidence could potentially support a finding that there is a likelihood of confusion and that Stroh has not "taken every reasonable precaution to prevent confusion or the practice of deception in the sale of its product." *Kellogg*, 305 U.S. at 122, 59 S.Ct. at 115. If Genesee can establish this at trial, along with secondary meaning, it may be granted an injunctive remedy that, while allowing Stroh to continue to market its beer and sell it as a "honey brown ale," would require Stroh to make more of an effort to ensure that its product is not confused with Genesee's.

Nevertheless, the district court did not err in denying the preliminary injunction. For the preliminary relief that Genesee requested—an injunction forbidding Stroh from using the words "Honey Brown" on its product—is inappropriate in a claim of unfair competition with respect to a generic mark. Where a generic mark is involved, "[t]he relief granted should go only so far as to alleviate the source confusion caused by [Stroh] and no further." *Forschner*, 904 F.Supp. at 1428. While a court may therefore "require the newcomer to distinguish its product or to notify consumers explicitly that its product does not come from the original manufacturer," *Forschner*, 30 F.3d at 359 (emphasis altered, internal quotation marks omitted), or otherwise "to use every reasonable means to prevent confusion," *Kellogg*, 305 U.S. at 121, 59 S.Ct. at 115, it may not prevent the defendant from using the plaintiff's mark altogether, *see id.* As such, even if Genesee was likely to prevail on this claim, the preliminary injunction sought could not have been granted. Hence, the district court did not abuse its discretion in denying it.

## CONCLUSION

Stroh has the right to add honey to its brown ale, and it has the right to call its beer what it is: a honey brown ale. Accordingly, Genesee may not recover for trademark infringement, and the district court properly refused to enjoin Stroh from using those words to label its beer. While Genesee has stated a claim for unfair competition, the specific preliminary injunctive relief that Genesee has sought is not available to it. We therefore affirm the district court's order without considering whether at trial Genesee is likely to succeed on the merits of its unfair competition claim.