**LANE CAPITAL MANAGEMENT, INC., Plaintiff,**

v.

**LANE CAPITAL MANAGEMENT, INC., Defendant.**

**No. 97 Civ. 1055(DC).**

United States District Court, S.D. New York.

July 31, 1998.

Fross, Zelnick Lehrman & Zissu, P.C., by Barbara A. Solomon, Rose Auslander, New York City, for plaintiff.

Cowan, Leibowitz & Latman, P.C., by J. Christopher Jensen, Felicia G. Traub, New York City, for defendant.

## OPINION

CHIN, District Judge.

This Lanham Act dispute stems from the parties' use of the identical trade name and service mark—"Lane Capital Management"—in connection with their respective businesses. Both parties offer investment services to individuals and institutions, and both claim exclusive right to use the mark on a nationwide basis.

Plaintiff Lane Capital Management, Inc. ("plaintiff"), began using the mark first, in December 1993, and its application to register the mark with the United States Patent and Trademark Office ("PTO") was granted after this action was filed.

Plaintiff now moves for summary judgment on all of its claims and for dismissal of defendant's sole counterclaim, reserving its right to prove damages at a later date but seeking now to enjoin defendant's use of the mark. See Fed.R.Civ.P. 56(a). Plaintiff argues that the mark is inherently distinctive and, hence, that the mark was immediately protected under common law principles when plaintiff began using the mark in December 1993.

Defendant Lane Capital Management, Inc. ("defendant"), on the other hand, contends that "Lane Capital Management" is merely a descriptive mark that must acquire secondary meaning before it may be protected, and that there are issues of fact as to whether secondary meaning has attached to the mark in the marketplace. Furthermore, although defendant concedes plaintiff adopted the name "Lane Capital Management" first, it contends that plaintiff's limited use of the name does not suffice to establish plaintiff as the senior user.

Ultimately, a reasonable jury could only conclude that plaintiff has acquired exclusive rights to the contested mark within the field of investment services and that defendant's continued use of the same mark will inevitably lead to consumer confusion and mistake. Plaintiff is therefore entitled to summary judgment on its federal service mark infringement claim and state law dilution claim. It has not, however, satisfied all elements for two of its claims—dilution of a "famous" mark and common law unfair competition—and thus summary judgment as to those claims would be premature. Accordingly, plaintiff's motion is granted in part and denied in part, defendant's counterclaim is dismissed, and an injunction will be issued.

## BACKGROUND

### A. Plaintiff

Plaintiff was incorporated under Delaware law and opened its doors for business under the name, "Lane Capital Management, Inc.," on December 27, 1993. Originally based in Greenwich, Connecticut, but having recently relocated to Rye, New York, the company identifies itself as "an investment manager specializing in fixed-income arbitrage." (Pl. Exh.JJ). Plaintiff utilizes the following financial instruments: mortgage-backed securities, U.S. Government securities, options, swaps, and futures. Its investment strategy, in a nutshell, is to minimize fluctuations in the market through diversification, and the average length of investments it recommends

are of short to medium duration, usually two to three years. On a risk scale, Lane Capital's investments are "positioned somewhere between conventional mortgage-backed funds and traditional hedge funds." (*Id.*).

At its inception plaintiff managed a single offshore arbitrage fund worth $10 million. It currently manages three hedge funds (three separate legal entities contained in one portfolio) that have approximately $200 million in equity (Lane Arbitrage Ltd., Lane Arbitrage International Ltd., and Lane Arbitrage II Ltd.), and handles the investments of institutional and wealthy individual clients. The investments advised by plaintiff are made in the United States, and involve the wide use of American-based financial instruments. At first, the majority of the funds' investors were from the United States, but the proportion of investors from offshore sources has since increased. (*See* Fulenwider Dep. at 144). One of the funds is listed on the Irish Stock Exchange.

The firm also has managed a few individual accounts since January 1994. In January 1994, two individual accounts opened in New York City banks with approximately $3 million. The third account was opened by an individual New York investor on March 3, 1994, in the amount of $49 million. (*See* Fulenwider Decl. ¶ 12; Pl. Confidential Exh. HH).

Other than its own business accounts, plaintiff did not, prior to July 1994, own or maintain a single brokerage, securities trading or clearing account in the United States. Plaintiff spends no money on advertising (*see* Fulenwider Dep. at 304), but has been listed under its trade name in Bloomberg L.P.'s online information service ("Bloomberg's")[1] since December 1993 and in Offshore Funds Directory, Inc., since March 1994, and is currently listed in over a dozen industry computer databases. Plaintiff has no direct responsibility for marketing or selling participations in the three hedge funds. Instead, investors are solicited by MeesPhierson

Fund Services (formerly "Eurodutch"), which also publishes a newsletter that provides monthly updates as to the performance of the funds managed by plaintiff. (*See id.* at 132–38).

Today, plaintiff conducts business with more than twenty well known corporations, including Dean Witter Reynolds, Inc., Smith Barney, and Paine Webber. Since the first quarter of 1996, plaintiff has been ranked among the top twenty best performing money managers within its respective peer group in "World's Best Money Managers," which is published by Nelson's Directory of Investment Managers ("Nelson's"). (*See* Pl.Exh. I).[2]

Paul E. Fulenwider, plaintiff's founder and owner, attests that he selected the trade name "Lane Capital Management, Inc.," based in part on his wife's suggestion of "Lane," which is his son's middle name and is the nickname and middle name of Fulenwider's father. (*See* Fulenwider, Dep. at 325). Fulenwider states that he adopted the term "Lane" not only because it would honor his father, but also because he felt that the word "means a straight and narrow, defined path, which suggests [his] investment philosophy." (Fulenwider Decl. ¶ 6). Prior to adopting the corporate name and service mark, Fulenwider searched Nelson's, Dun & Bradstreet, and other trade publications and related sources.

## B. *Defendant*

Defendant was incorporated under New York law on July 6, 1994. It does not manage hedge funds, but instead provides investment advice primarily to individuals who seek to invest personal funds in stocks and bonds for long-term growth, and currently advises approximately 700 investment accounts or portfolios that have a present asset value in excess of $700 million. (*See* Lane Aff. ¶¶ 5–6). Its investors are located throughout the country. Defendant began

---

**1.** Bloomberg's subscriptions apparently include approximately 85,000 computer terminals. (*See* Pl.Exh. O).

**2.** To be considered for ranking by Nelson's, an investment manager must, among other things, have traditional U.S. Equity, Fixed, and Balanced Accounts of at least $10 million in the performance record. (*See* Pl.Exh. I).

soliciting clients in July 1994 under its corporate name, "Lane Capital Management, Inc."

Douglas C. Lane, the President and majority shareholder of defendant, states that he did not conduct a trademark search before settling on the name, which he chose, like Fulenwider, at the suggestion of his wife. (*See* Lane Aff. ¶¶ 9, 12).

On July 15, 1994, defendant applied to register with the U.S. Securities and Exchange Commission ("SEC") as an investment adviser. That application was approved on July 25, 1995.[3]

### C. *Plaintiff's Registration of the Mark*

Plaintiff applied to register its mark with the PTO on November 12, 1996. On January 30, 1998, the PTO issued a trademark registration, Reg. No. 2,132,180, to plaintiff for the use of the service mark "Lane Capital Management" in connection with "financial services, namely, investment management in the field of securities, commodities and other investment media." (Pl.Exh.II). The PTO did not raise any issues of registrability and issued a certificate of registration to plaintiff without requiring plaintiff to show that the mark had acquired secondary meaning. After learning that a certificate had been issued, defendant petitioned to cancel plaintiff's registration. That petition is still pending.

### D. *Prior Proceedings*

On February 14, 1997, plaintiff commenced this action against defendant, alleging federal service mark infringement, dilution of a famous mark, injury to its business reputation or dilution of its mark under New York law, and common law unfair competition. Defendant counterclaimed for false designation of origin pursuant to 15 U.S.C. § 1125(a) and sought injunctive relief.

This motion followed.

---

3. Plaintiff, however, has not yet applied to register with the, SEC, believing, among other things, that it is not required to do so because its prac-

## DISCUSSION

### A. *Legal Standards*

The Federal Rules of Civil Procedure provide that summary judgment shall be granted when the submitted pleadings, depositions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In resolving a motion for summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party.

To prevail on a service mark claim, a plaintiff must show that "it has a valid [trade]mark entitled to protection and that the defendant's use of it is likely to cause confusion." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995)); *see* 15 U.S.C. § 1114. A service mark is "any word, name, symbol, or device, or any combination thereof" used to "identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127.

The applicable law, as it has developed over the years, divides service marks into five general categories based on a mark's distinctiveness and protectability: (1) fanciful; (2) arbitrary; (3) suggestive; (4) descriptive and (5) generic. The term "fanciful" usually applies to marks "invented solely for their use as [service] marks" that employ common words in an arbitrary or unfamiliar way. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 n. 12 (2d Cir. 1976). A suggestive mark "employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of [the] goods [or services]." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993). A descriptive mark "describes a product's features, qualities, [uses,] or in-

---

tice does not yet handle 15 or more separate clients. (*See* Fulenwider Decl. ¶ 29).

gredients in ordinary language." *Id.* Finally, a generic mark is "generally a common description of goods" or services or refers "to the genus of which the particular product is a species." *Genesee Brewing Co.,* 124 F.3d at 143 (internal citations omitted).

■ Arbitrary, fanciful, or suggestive marks are viewed as "inherently distinctive," and are entitled to full and immediate protection under the Lanham Act. *See id.* Marks that are merely descriptive, however, are entitled to protection only if they have acquired "secondary meaning" in the marketplace. Generic marks do not, under any circumstances, receive trademark protection. *See id.*

Under the Lanham Act, a certificate of registration constitutes "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." 15 U.S.C. § 1057(b); *see Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 854 (2d Cir.1988).

■ Because plaintiff successfully registered the name prior to defendant, the registration constitutes prima facie proof of the mark's validity. In this case, defendant bears the burden of demonstrating either that plaintiff's mark is invalid or that the use of its own mark is not likely to confuse consumers.

## B. *Application*

### 1. *Validity of the Mark*

Defendant challenges the validity of plaintiff's service mark on two principal grounds: (1) that it is primarily merely a surname or given name requiring proof of secondary meaning, and (2) that no such secondary meaning has been established because (a) plaintiff's use of the mark in the United States prior to defendant's use of the mark was negligible, and (b) plaintiff's use of the mark prior to defendant's use of the mark was unlawful.

### a) *Type of Mark*

■ The first task is to categorize plaintiff's registered mark—specifically, whether it is a purely descriptive mark, as defendant contends, or a suggestive or even arbitrary mark, as plaintiff insists. Viewing the mark as a whole, I conclude that the mark is not a purely descriptive mark, but rather is an arbitrary mark. It is not, as defendant contends, primarily merely a surname, nor is it a given name. Moreover, the mark does not describe in any way plaintiff's services or anyone actually associated with the company. The mark also is not evocative of any particular investment philosophy and does not have any favorable connotations; thus it is not a suggestive mark. Instead, as explained below, the mark is arbitrary in that it employs a common word that also happens to be a popular name with other words in an arbitrary way to form a distinctive composite.

Plaintiff argues that the mark is merely a surname or given name, citing various cases that hold that names generally are treated as descriptive terms. It is well settled that a mark that is "primarily merely a surname" may not be registered absent a showing of acquired distinctiveness. 15 U.S.C. § 1052(e)(4). Similarly, under the common law, personal names are treated as descriptive terms requiring proof of secondary meaning to receive legal protection. *See Pirone v. MacMillan, Inc.,* 894 F.2d 579, 583 (2d Cir.1990); *815 Tonawanda St., Corp. v. Fay's Drug Co.,* 842 F.2d 643, 648 (2d Cir. 1988). Whether a mark is a surname or personal name "depends upon whether its primary significance to the purchasing public is that of a surname" or personal name. *See In re Hamilton Pharm. Ltd.,* 27 U.S.P.Q.2d 1939, 1993 WL 368803 (T.T.A.B.1993). Hence, Fulenwider's subjective intent in adopting the mark is not controlling.

Applying this test, it is obvious that, contrary to defendant's position, the contested mark is not primarily merely a surname or a given name. The fact that the PTO registered the mark without requiring proof of secondary meaning "affords a rebuttable presumption that the mark is more than merely descriptive." *Simon & Schuster, Inc. v. Dove Audio, Inc.,* 970 F.Supp. 279, 292 n. 15

(S.D.N.Y.1997) (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1132 (1979)); *see also Abercrombie & Fitch*, 537 F.2d at 11.

More important, defendant fails to present evidence to create an issue of fact as to the presumptive validity of plaintiff's mark. The fatal flaw in defendant's argument is its undue emphasis on the word "Lane" to the exclusion of the other elements of the mark. The mark at issue here is not "Lane" alone, but "Lane Capital Management."[4] The long-standing principle governing determination of a mark's validity is that one must view the mark in its complete form rather than dissect it into its component parts. *See In re Hutchinson Tech. Inc.*, 852 F.2d 552, 554 (Fed.Cir.1988); *see California Cooler, Inc. v. Loretto Winery, Inc.*, 774 F.2d 1451, 1455 (9th Cir.1985) ("[A] composite may become a distinguishing mark even though its components individually cannot.").

In any event, although the word "Lane" can be a person's name,[5] the term in isolation does not primarily have surname (or given name) significance, for "Lane" is also a common word in the English language meaning "narrow path." Consequently, even taking the word "Lane" by itself, the mark is not primarily merely a surname or given name. *See, e.g., Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir.) ("Domino" not primarily merely surname), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Fisher Radio Corp. v. Bird Elec. Corp.*, 162 U.S.P.Q. 265, 1969 WL 9101 (T.T.A.B.1969) ("Bird" not primarily surname because of common dictionary meaning); *In re Hunt Elec. Co.*, 155 U.S.P.Q. 606, 1967 WL 7296 (T.T.A.B.1967) ("Hunt" held not

primarily merely surname despite surname significance); *Ex parte Rivera Watch Corp.*, 106 U.S.P.Q. 145, 1955 WL 6450 (Comm'r Pats.1955) ("Rivera" not primarily merely surname).[6] From the face of the mark, neither meaning of the word is clearly suggested.

Defendant argues that it is more likely than not that a reasonable consumer would view the mark as a surname or personal name because many corporations in the financial community employ their founders' names in their trade name. While that is certainly true to some extent, this argument does not get defendant very far, for many of those marks contain unmistakable signs (which are absent here) evoking an individual's name: such as including arguable first names, employing more than one apparent name,[7] adding initials, or containing additional words bolstering the surname significance of certain terms. *See, e.g., In re Etablissements Darty et Fils*, 759 F.2d 15 (Fed.Cir.1985) ("Darty et Fils," meaning "Darty and Son" in French, held to be nonregistrable without proof of distinctiveness).

Under the present circumstances, where only one element of the mark has both a strong surname and a non-surname significance, an average member of the purchasing public would not view the mark as a whole as primarily merely a surname or as a personal name. *See, e.g., In re Hutchinson Tech.*, 852 F.2d at 554 (public unlikely to view "Hutchinson Technology" as a whole to be surname); *WLWC Centers, Inc. v. Winners Corp.*, 563 F.Supp. 717, 720 (M.D.Tenn.1983) ("Mrs. Winners" protectable despite surname significance); *In re Allied Mills, Inc.*, 150 U.S.P.Q.

---

**4.** On this point, *815 Tonawanda Street Corp.*, 842 F.2d 643, is distinguishable. There, the contested mark "Fay's" was a single word having primarily personal name meaning.

**5.** As defendant correctly points out, "Lane" certainly is a widely-used surname and male personal name: indeed, it is ranked 170th among the most popular American surnames, and there are almost 1,000 listings for residential phone numbers under "Lane" in New York City alone. (*See* Def.Exhs. O, P).

**6.** The Trademark Act of 1946 considerably liberalized registration of personal names and sur-

names. The legislative history of the Act, for example, indicates that the law was intended to permit registration of such names as "Cotton" and "King" but not such names as "Johnson" or "Jones". *See Ex parte Rivera Watch Corp.*, 106 U.S.P.Q. at 149, 1955 WL 6450.

**7.** Defendant's examples of "Merrill Lynch," "Morgan Stanley," "Dean Witter," "Donaldson Lufkin & Jenrette," "Goldman Sachs,'$'" "Paine Webber," and "Salomon Smith Barney," all employ more than one term that appears to be a name. In this sense alone, plaintiff's mark is not comparable to these marks.

757, 757, 1966 WL 7295 (T.T.A.B.1966) (composite mark "Wayne Fryers" not primarily surname); *Ex parte Norquist Prods., Inc.,* 109 U.S.P.Q. 399, 400, 1956 WL 8063 (Comm'r Pats.1956) ("Norquist Coronet" held to be "distinctive composite"). Defendant has not cited any comparable cases, in which a composite mark containing only one word with a strong surname and non-surname meaning was held nonregistrable. The mark, in short, is not a descriptive mark in the sense that a reasonable consumer would view it as a name.

The challenged mark is also not merely descriptive because, strictly speaking, it does not "convey an immediate idea" of any particular feature or quality of plaintiff's services, nor does it describe any specific individual associated with the firm. *In re Hutchinson Tech.,* 852 F.2d at 555.

Nor is the mark suggestive, evoking any particular investment philosophy or a favorable attribute of plaintiff's services. An average member of the purchasing public would not think of any particular brand of investment services upon hearing or viewing "Lane Capital Management." Nor does the noun form of the word "Lane" necessarily imply a direct or focused approach or strategy (a lane need not be straight, but its typical connotation is that it is "narrow") or any other characteristic. Hence, the mark is not a suggestive one.

Although it is not an ideal fit, the mark is best characterized as an arbitrary mark, one that "has an actual dictionary meaning, but that meaning does not describe the [service]." *Arrow Fastener,* 59 F.3d at 391. The mark does not have any strong connotations, does not clearly identify with any particular individual, and does not describe the services offered by its user. *See, e.g., Ross Bicycles, Inc. v. Cycles U.S.A., Inc.,* 765 F.2d 1502, 1506 (11th Cir.1985) (finding "Ross" to be an arbitrary mark where used in connection with bicycle manufacturing), *cert. denied,* 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 306 (1986); *Varitronics Sys., Inc. v. Merlin Equip., Inc.,* 682 F.Supp. 1203, 1207 (S.D.Fla.1988) ("Merlin" deemed "at the very least suggestive, if not an arbitrary" mark); *Satinine, s.n.c. di Usellini & C. v. Les Par-*

*fums de Dana, Inc.,* 1984 WL 830, No. 83 Civ. 1679(CBM) (S.D.N.Y. Aug. 31, 1984) ("Dana" an arbitrary mark in part because no individual named "Dana" associated with company); *Amstar Corp.,* 615 F.2d at 260 ("Domino" an arbitrary mark as applied to sugars and related food products). For these reasons, it makes most sense to classify it as an arbitrary mark.

Because the mark is not merely descriptive, and defendant otherwise fails to rebut the presumption that the mark is inherently distinctive, plaintiff need not demonstrate secondary meaning for the mark to be protectable.

### b) *Priority of Use*

The next step is to identify the senior user. The "talismanic test" for sufficient prior use in commerce is whether a person's use of the mark was "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Housing & Servs., Inc. v. Minton,* No. 97 Civ. 2725(SHS), 1997 WL 349949, at *3 (S.D.N.Y. June 24, 1997) (citation omitted).

In this case the uncontroverted facts show that plaintiff first used the mark in connection with its services in the United States, and has continuously done so. Plaintiff's use of the service mark on its letterhead and business cards in connection with its services and in its dealings with third parties prior to July 1994—in particular, by providing investment advice to, and conducting trades on behalf of, the offshore hedge fund, Lane Arbitrage Ltd., and several individuals' accounts prior to the date of defendant's admitted first usage of the mark—suffices to demonstrate its prior use. (*See* Pl.Exhs. C, LL, Pl. Confidential Exh. HH). There is no suggestion that plaintiff has ever discontinued its use of the mark or abandoned the mark. By its actions, then, plaintiff has made bona fide use of the mark and, hence, has expressed its "intention to continue exploiting the mark commercially." *H.W. Carter & Sons, Inc. v. William Carter Co.,* 913 F.Supp. 796, 802 (S.D.N.Y.1996) (citation omitted).

Thus, there is no real dispute here that plaintiff has been exploiting the mark commercially in a continuous fashion since December 1993, and that defendant did not begin use of the identical mark until at least six months later. Rather, defendant argues that the quantum of plaintiff's use in the United States prior to its own use was insufficiently public as to establish priority. This argument, however, has no merit. The use of a protectable mark need not have gained wide public recognition, for "[a]doption and a single use of the mark may be sufficient to entitle the user to register the mark." *Buti v. Impressa Perosa*, 935 F.Supp. 458, 468 (S.D.N.Y.1996) (quoting *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.1974)), *aff'd*, 139 F.3d 98 (2d Cir.1998).

■ Defendant further contends that plaintiff's use of the contested mark before July 1994 was unlawful because plaintiff had not registered with the SEC as an investment advisor as required by 15 U.S.C. § 80b–3. Because defendant has not raised the defense of illegal use until now and has made no effort to amend its answer, however, it is barred from doing so. *See* Fed.R.Civ.P. 8(c); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1394 at 776–81 (2d ed.1990) (stating that failure to plead affirmative defense ordinarily results in waiver of that defense).

Even assuming, *arguendo*, that defendant could assert an unlawful use defense, it has failed to submit evidence sufficient to raise an issue of fact in this respect. Courts have held that

> a use can be held unlawful only when the issue of compliance has previously been determined (with a finding of non-compliance) by a court or government agency having competent jurisdiction under the statute involved, or where there has been a per se violation of a statute regulating the sale of a party's goods.

*Erva Pharm., Inc. v. Am. Cyanamid Co.*, 755 F.Supp. 36, 40 (D.P.R.1991) (citing *Kellogg Co. v. New Generation Foods, Inc.*, 6 U.S.P.Q.2d 2045, 2047 (1988)). Defendant has not alleged, much less shown, that a competent court or government agency has ever determined that plaintiff has violated the securities registration law or that plaintiff has ever received any notice from competent authorities that it was being investigated for violating this law.

Nor has defendant adduced evidence suggesting that plaintiff has *per se* violated the law. An investment adviser is exempt from registering with the SEC if:

> during the course of the preceding twelve months [it] has had fewer than fifteen clients and [it] neither holds [it]self out generally to the public as an investment adviser nor acts as an investment adviser to any investment company registered ... under this chapter, or a company which has elected to be a business development company....

15 U.S.C. § 80b–3(b)(3). Defendant has not offered evidence tending to show that plaintiff has had fifteen or more clients during the relevant time period. Additionally, Fulenwider has testified that plaintiff does not advertise publicly, and defendant concedes that: (1) there is "no evidence that plaintiff promoted its services ... prior to ... July, 1994"; (2) plaintiff has issued no "written brochures, letters, advertisements, offering statements, correspondence or other materials"; and (3) plaintiff's listings in Nelson's and the Offshore Funds Directory are not evidence that "plaintiff offers any services to the public." (Def. Local Civil Rule 56.1 Statement ¶ 3; Def.Br. at 16–17). Consequently, defendant has failed to raise an issue of fact as to whether plaintiff has held itself out "generally to the public as an investment advisor" within the meaning of § 80b–3(b)(3) or, more broadly, that plaintiff used its service mark in violation of federal securities laws prior to July 1994.

### 2. *Likelihood of Confusion*

■ The next issue that must be addressed in determining service mark infringement is the likelihood that consumers would be confused as to the source of plaintiff's services by defendant's use of the same mark. The Second Circuit has identified the following factors to be considered in assessing whether a likelihood of consumer confusion exists: (1) the strength of the protected

mark; (2) the degree of similarity between the two marks; (3) the proximity of the services; (4) the likelihood that the prior user will bridge the gap; (5) evidence of actual confusion or the lack thereof; (6) the intent of the junior user; (7) the quality of the services; and (8) the sophistication of the buyers. *See Polaroid Corp v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

After weighing these factors, I conclude that the uncontroverted facts show an overwhelming likelihood of confusion. While defendant contends that issues of fact remain as to the extent of actual confusion, any remaining disputes are minimal and not material to the resolution of this legal question. The identical nature of the marks, their use in connection with similar services, and the evidence of actual confusion demonstrates that the relevant public likely has been, and will continue to be, confused as to the source of the services associated with the marks. There is also a substantial possibility that consumers will wonder whether the companies are associated or whether one party has licensed its name to the other.

First, while the mark is an arbitrary mark meriting Lanham Act protection, the record suggests that it is not a particularly well known one. In other words, the mark is inherently distinctive, but not yet so distinctive in the marketplace that consumers instantly recognize and associate it with certain services. Plaintiff's name and mark certainly has been circulated through trade publications, but its strength with individual investors is not clear. Plaintiff submits no consumer surveys as to popular name recognition, instead relying on the affidavits of two individuals within the financial community who declare in conclusory fashion that plaintiff's name was "well known throughout a broad geographic area before defendant began using the identical name." (Doerrer Decl. ¶ 1; *see also* Lieblich Decl. ¶ 2). These affidavits, however, are of little value in assessing the strength of plaintiff's mark. Additionally, the word "Lane" is in common usage, and there are numerous registered service marks with the term "Lane", including "Lane Financial Group" and "Lane Financial Services." In sum, the record tends to show that plaintiff's mark is not very strong. *See WLWC Centers*, 563 F.Supp. at 722 (finding mark relatively weak in part because of plethora of registered marks with same word). This factor favors defendant.

Second, the contested corporate names and marks are not merely similar, but identical. No rational jury could find otherwise. There is an absence of any distinguishing features or disclaimers on defendant's mark tending to dispel confusion as to source. This factor alone therefore not only strongly suggests a likelihood of consumer confusion, even across service submarkets, but that such consumer mistake is inevitable. *See Original Fowler's Chocolate Co. v. Fowler*, 1994 WL 721359, *7 (W.D.N.Y. Dec.19, 1994) ("There is a great likelihood of confusion when an infringer uses the exact trademark") (quoting *Opticians Ass'n v. Indep. Opticians*, 920 F.2d 187, 195 (3d Cir.1990)); *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96, 127 (S.D.N.Y.1989) (where marks are "virtually identical ... consumer confusion is inevitable").

Third, although defendant asserts that the parties' services are not similar, the unrebutted facts show that there is some overlap in the services identified with the respective marks. Thus, there is no need for a trial on this factor. To the extent defendant does not manage or solicit investors for hedge funds but focuses mainly on stocks and bonds, the parties might be said to concentrate in different submarkets within the field of financial services. Both parties, however, seek out wealthy individuals and institutions desiring investment opportunities. Both parties also deal with many of the same financial institutions, sometimes employing the same brokers. (*See* Fulenwider Decl. ¶ 31(a)). Both corporations make use some of the same financial vehicles, such as money market instruments, U.S. Treasury bills, U.S. Treasury bonds, and municipal securities. (*See* Def. Local Civil Rule 56.1 Statement ¶ 25) (conceding this fact). Thus, the differences in investment strategies are not so great here that, alone, they mitigate the likelihood of confusion resulting from the identi-

cal mark and the otherwise proximate location of the services in the marketplace. *See, e.g., In re United California Brokers, Inc.,* 222 U.S.P.Q. 361, 1984 WL 63043 (T.T.A.B. 1984) (finding similarity of services despite fact that registrant was legally prohibited from offering many services provided by applicant); *American Stock Exch., Inc. v. American Express Co.,* 207 U.S.P.Q. 356, 364–65, 1980 WL 30139 (T.T.A.B.1980) (finding services were closely linked even though plaintiff's services did not include defendant's exact services). There is, therefore, sufficient similarity in services and some degree of competition "for the same investment dollars." *Lexington Management Corp. v. Lexington Capital Partners,* 10 F.Supp.2d 271, 284–85 (S.D.N.Y. 1998).

The undisputed evidence relating to the fourth factor, bridging the gap, also suggests likelihood of confusion. Plaintiff's reputation has been established largely as a result of its higher-risk arbitrage trading activities, while defendant has built its reputation by concentrating on offering traditional long-term investment advice to individuals. Nevertheless, Lane Capital has expressed a desire to aggressively expand to target individuals in the near future, and defendant has not forsworn taking on institutional clients.[8] Thus, the likelihood that the parties will directly compete for the same dollars continues to grow.

Fifth, there is anecdotal evidence of actual confusion on the part of not only random seekers of information, but also sophisticated persons. The record reflects, for example, that plaintiff has received telephone calls from several individuals mistakenly inquiring about defendant's services. (*See* Namkung Decl. ¶ 5). Plaintiff's personnel also attest that they had several conversations with a representative of Paine Webber, who was under the belief that plaintiff was actually defendant. The State of New York also apparently confused the two companies, leading it to believe that plaintiff did not have disability insurance. (*See* Carino Decl. ¶ 6). Agents of other financial institutions have also mistakenly reached employees of plaintiff, seeking employees of defendant. (*See id.*). Defendant does not deny that these incidents have occurred, but merely describes them as "isolated" in nature. Its own records, however, indicate that it, too, has received inquiries confusing plaintiff's services with its own. (*See* Pl.Exh. BB). While there may be some dispute as to the exact extent of actual confusion, the record is clear that some actual confusion has occurred, and that future confusion among the public is likely, especially as one or both corporations achieve greater financial success.

Sixth, as to the issue of defendant's intent, this factor slightly favors defendant. While defendant plainly failed to thoroughly investigate the existing marks within its field of expertise before adopting its mark, and did not even conduct a basic trademark search before it began using the contested mark, the evidence does not unequivocally show that it copied plaintiff's mark in bad faith or intentionally sought to trade on its goodwill. Indeed, that plaintiff was a relatively obscure firm in existence for six short months before defendant began using the mark suggests a lack of bad faith on the part of defendant.

In an effort to prove that defendant has engaged in bad faith infringement, plaintiff has submitted an affidavit from a former employee of defendant who swears he made Lane aware of plaintiff's existence as early as the fall of 1994 (*see* Hamilton Decl. ¶ 3–5), but Lane denies ever having such a conversation. (*See* Lane Aff. ¶ 18). Despite this obvious credibility issue, even if one were to believe the employee, it would only establish that defendant was aware of plaintiff's existence, but that would nevertheless be consistent with defendant's stated belief that it, not plaintiff, was legally entitled to use the mark. Still, this issue is of little import, for "inten-

---

**8.** Defendant relies heavily on *Haven Capital Management Inc. v. Havens Advisors, L.L.C.,* 965 F.Supp. 528 (S.D.N.Y.1997), in which injunctive relief was denied in part because of the companies' different investment strategies. *Haven Capital,* however, is distinguishable in at least two respects. First, there, the marks were not substantially similar, whereas here, the marks are identical. Second, in *Haven Capital,* the plaintiff expressed no desire to compete with defendant, while in this case, plaintiff has signalled its intention to compete against defendant, and there is every reason to believe that such competition will increase.

tional copying is not a requirement under the Lanham Act ... [and] intent is largely irrelevant in determining if consumers likely will be confused as to source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986).

The seventh factor—the quality of the parties' respective services—is a wash. Both companies seem to offer high quality investment services, and there is no suggestion in the record to the contrary.

The eighth and final consideration is the relative sophistication of the buyers. Defendant argues that sophisticated investors will not confuse the two companies or their services, and that is certainly true to some extent. But given the relative proximity in services, the identical nature of the marks, and the parties' mutual position that both cannot go on using the same mark, that argument is of little value. Where, as here, "the [services] are [virtually] identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion." *McGregor–Doniger,* 599 F.2d at 1137.

Application of the foregoing *Polaroid* factors by any reasonable factfinder would lead to the inescapable conclusion that defendant's continued use of the contested mark will inevitably lead to confusion among the relevant segment of consumers. Plaintiff is therefore entitled to summary judgment on its trademark infringement claim and its dilution claim under N.Y. Gen. Bus. Law § 360–1,[9] and, at a minimum, to the permanent injunctive relief it presently seeks.

▆▆▆▆ Summary judgment must be denied, however, as to plaintiff's claims for dilution of a famous mark under 15 U.S.C. § 1125(c) and common law unfair competi-

tion. The record does not support plaintiff's contention that the mark is a strong mark, much less a famous one. Few marks are ever famous, the short life of plaintiff's mark makes it highly unlikely that the mark has become ingrained in the collective mind of consumers, and plaintiff has tendered no evidence of its respective share of the financial services market or of consumer awareness or identification of the mark suggesting that the mark has become closely associated with plaintiff or its services. *See Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co.,* 1998 WL 193246, at *2 (S.D.N.Y. Apr.21, 1998) ("all trademarks are 'distinctive'—very few are 'famous' ") (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:91, at 24–149 (4th ed.1998)). Similarly, as discussed before, the present record does not establish with clarity that defendant has acted in bad faith, an essential element of unfair competition. *See Genesee Brewing,* 124 F.3d at 149; *Castle Rock Entertainment v. Carol Publ'g Group, Inc.,* 955 F.Supp. 260, 272 (S.D.N.Y.1997), *aff'd,* 150 F.3d 132 (2d Cir.1998).

### 3. *Scope of the Injunction*

▆▆▆▆ The final question is the appropriate scope of the injunction. As to the geographic scope of the proposed injunction, where, as here, both sides offer services nationwide, and neither provides solely local services, injunctive relief should be fashioned on a national basis.

In addition, because "Lane" is the surname of defendant's founder and because plaintiff has not unequivocally demonstrated that defendant has acted in bad faith, the justification for narrowly tailoring injunctive relief so as to accommodate Lane's qualified right to

---

**9.** N.Y. Gen. Bus. Law § 360–1 provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief ... notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

Dilution may be shown through proof of tarnishing or blurring. The record does not support a finding of tarnishing here, though, for there is nothing to suggest that defendant has linked the mark to services of "shoddy quality" or otherwise portrayed the mark in an "unwhole-

some or unsavory context." *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 506 (2d Cir.1996). The uncontested facts do demonstrate blurring, however, which turns on many of the same but fewer factors previously analyzed under likelihood of confusion: (1) similarity of the marks; (2) similarity of the services; (3) sophistication of the consumers; (4) renown of the senior mark; and (5) renown of the junior mark. The strength of defendant's mark is less important here, as both marks are relatively new to the market.

make use of his own name in connection with his business is a strong one. As the Second Circuit has recognized,

> to prohibit an individual from using his true family name is to take away his identity ... and that is so grievous an injury that courts will avoid imposing it, if they possibly can.

*Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735 (2d Cir.1978) (quoting *Societe Vinicole de Champagne v. Mumm*, 143 F.2d 240, 241 (2d Cir.1944)). Accordingly, defendant is hereby permanently enjoined from imitating, copying, using, reproducing, displaying, or authorizing or aiding any third party to imitate, copy, use, reproduce or display the corporate name and trademark, "Lane Capital Management," or any confusingly similar name or mark in connection with its services on a nationwide basis.

Defendant may, however, use the full name of its founder or his initials in conjunction with his last name, so long as the mark, viewed in its entirety, is not confusingly similar to plaintiff's protected mark.

## CONCLUSION

Plaintiff's motion is granted in part and denied in part, and defendant's counterclaim is dismissed. Judgment will be entered in favor of plaintiff: (1) awarding it equitable relief on its federal service mark infringement claim and state dilution claim, and (2) dismissing defendant's counterclaim. A trial will be held on the amount of damages, if any, and on plaintiff's claims for dilution of a famous mark and common law unfair competition, unless plaintiff desires to discontinue these claims without prejudice.

The parties shall appear for a pretrial conference on August 28, 1998 at 10:00 a.m.

SO ORDERED.